# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT KNOXVILLE
## August 21, 2013 Session

## JONATHAN WESLEY STEPHENSON v. STATE OF TENNESSEE

### Circuit Court for Cocke County
### No. 30,366-I   Ben W. Hooper, II, Judge

### No. E2012-01339-CCA-R3-PD - Filed January 13, 2014

A Cocke County jury convicted petitioner, Jonathan Wesley Stephenson, of first degree premeditated murder and conspiracy to commit first degree murder. The jury imposed the death penalty for the murder conviction, and the trial court sentenced petitioner to twenty-five years for the conspiracy conviction. After several appeals, remands, and collateral proceedings, petitioner's resulting sentence was the death penalty for the murder conviction and a sixty-year sentence for the conspiracy conviction. Petitioner then sought post-conviction relief. Following an evidentiary hearing, the post-conviction court denied relief. Petitioner now appeals the denial of relief, alleging multiple claims of ineffective assistance of counsel. Following our review of the record, we discern no error and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Daniel E. Kirsch and Avram Frey, Office of the Post-Conviction Defender, Nashville, Tennessee, for the petitioner, Jonathan Wesley Stephenson.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; James B. Dunn, District Attorney General; and William Brownlow Marsh, Assistant District Attorney General, for the respondent, State of Tennessee.

## OPINION

### I. Procedural History

Petitioner was convicted of the 1989 first degree premeditated murder of his wife and conspiracy to commit first degree murder. *State v. Stephenson*, 878 S.W.2d 530 (Tenn. 1994). He hired his co-defendant, Ralph Thompson, Jr., to help him kill the victim. *Id.* at 535-36. Petitioner had been unsuccessful in two previous attempts to solicit assistance from other people. *Id.* at 535. Petitioner received the death penalty for the murder conviction and a twenty-five-year sentence for the conspiracy conviction. *Id.* at 534. The jury found the existence of one aggravating circumstance: "[T]he defendant . . . employed another to commit the murder for remuneration or the promise of remuneration." *Id.* (quoting Tenn. Code Ann. § 39-13-204(i)(4)) (hereinafter referred to as the "murder for hire" aggravator). His co-defendant was also convicted separately of the same crimes, but the jury sentenced him to life in prison instead of death for the murder conviction, and he received a twenty-two-year sentence for conspiracy. *See State v. Ralph Thompson, Jr.*, No. 03C01-9201-CR-00006, 1992 WL 322404 (Tenn. Crim. App. Nov. 10, 1992), *perm. app. denied* (Tenn. Mar. 29, 1993) (issues related to convictions only), *appeal after remand*, No. 03C01-9306-CR-00177, 1994 WL 263177 (Tenn. Crim. App. June 15, 1994), *perm. app. denied* (Tenn. Aug. 28, 1995) (resentencing hearing).

In the first direct appeal in this case, the supreme court affirmed petitioner's convictions but remanded the matter for resentencing on both convictions because the jury was incorrectly instructed on the burden of proof regarding the aggravating circumstance and because the jury was provided an outdated verdict form. *Stephenson*, 878 S.W.2d at 57-58. Following remand, the parties agreed to a sentence of life without parole for the murder conviction and a consecutive sixty-year sentence for the conspiracy conviction.

Petitioner filed his first petition for post-conviction relief in 1995, challenging the plea negotiations following remand. He voluntarily withdrew that petition. In 1998, he filed his first habeas corpus petition in which he challenged the legality of his life without parole sentence. *Stephenson v. Carlton*, 28 S.W.3d 910 (2000). On appeal, the supreme court concluded that the sentence was, in fact, illegal because at the time of the crime in this case, life without parole was not an available penalty for first degree murder. *Id.* at 912. However, the court specifically noted that its ruling did not affect the sixty-year sentence for the conspiracy conviction, which petitioner did not challenge in his habeas corpus petition and which the court concluded was not void or illegal. *Id.* at 912 n.3.

Thereafter, the trial court held a new sentencing hearing on the first degree murder conviction. During this second remand, the State again filed a notice of intent to seek the

death penalty. The sentencing jury found that the same "murder for hire" aggravating circumstance outweighed the mitigating evidence and sentenced petitioner to death. *State v. Stephenson*, 195 S.W.3d 574, 585 (2006). The supreme court affirmed the death sentence on appeal. *Id.* at 581. The court again noted that petitioner waived any challenge to his sixty-year sentence for the conspiracy conviction. *Id.* at 596 n.16.

Petitioner has also filed three petitions for writ of habeas corpus since the second remand for resentencing. He voluntarily dismissed the first petition, filed in June 2004. *See Jonathan W. Stephenson v. Ricky Bell, Warden*, No. M2011-01562-CCA-R3-HC, 2012 WL 2356586, at *2 (Tenn. Crim. App. June 20, 2012), *perm. app. denied* (Tenn. Nov. 28, 2012). He filed the second petition in June 2010. *Id.* In that petition, he challenged the trial court's actions in the initial remand after the first direct appeal. As noted above, the State agreed to a sentence of life without parole for the murder conviction and a sixty-year sentence for the conspiracy conviction. However, at the time of the plea submission, in addition to accepting those sentences, the trial court also accepted petitioner's guilty pleas to both indicted offenses. *Id.* at *1. The judgment sheet filed by the trial court in 1994 reflected that petitioner was not only "found guilty" after a jury trial but that he also "pled guilty" to the offenses. *Id.* According to petitioner's habeas corpus argument, his guilty pleas in 1994 voided the original jury convictions rendered in 1990. *Id.* at *4. Thus, he claimed that when the supreme court remanded the case for resentencing in 2000, he should have been permitted to withdraw his guilty pleas and either enter into a new plea agreement or proceed to a new trial. *Id.* The habeas court denied relief. This court held that the trial court lacked jurisdiction in 1994 to accept petitioner's guilty pleas to the offenses because it was limited on remand to conducting a new sentencing hearing. *Id.* This court further noted that the supreme court had already affirmed the 1990 jury convictions; thus, the convictions for first degree murder and conspiracy to commit first degree murder stemmed from the original jury trial, not the resentencing hearing in 1994. *Id.* at *4-5. Accordingly, the trial court's jurisdiction at resentencing was limited to determining the appropriate sentence for petitioner's valid 1990 convictions by a jury. *Id.* at *5.

In his third petition for habeas corpus relief, petitioner challenged the validity of his sixty-year sentence for conspiracy. The habeas corpus court dismissed his petition, and this court affirmed the court's ruling. *See Jonathan Stephenson v. Ronald Colson, Warden*, No. M2013-00720-CCA-R3-H, 2013 WL 6705997 (Tenn. Crim. App. Dec. 19, 2013). Petitioner timely filed his second petition for post-conviction relief in October 2006. The instant appeal stems from the post-conviction court's May 31, 2012 order denying relief on that petition. In this appeal, petitioner argues that he received ineffective assistance of counsel in the following areas: (1) failure to advocate for specific performance of the plea agreement; (2) failure to argue against the applicability of the sole aggravating circumstance; (3) failure to contest the admission of his statement of law enforcement officers; (4) failure to advance an

3

argument with regard to the State's pursuit of inconsistent theories in his trial and his co-defendant's trial; (5) failure to present sufficient mitigating evidence at his resentencing hearing; (6) failure to object to allegedly improper victim impact evidence; (7) failure to contest various jurors during voir dire; and (8) failure to adequately challenge Tennessee's death penalty statute.

## II. Facts

### A. Facts from Trial (Resentencing)

The facts of this case were summarized by the supreme court in its 2006 opinion:

At the resentencing hearing, the State presented proof showing that in December 1989, the defendant was married to Mrs. Stephenson and had a four-year-old son and an eight-month-old son. The defendant worked as a tractor-trailer driver in Morristown, Tennessee. In March 1989, the defendant met Julia Ann Webb ("Webb") at a bar in Knoxville, Tennessee, and the two became romantically involved. The defendant told Webb that his wife had been killed in a traffic accident five years earlier and that afterwards he had an affair with his wife's sister, "Kathy." He also told Webb that he had a child with each woman.

In 1989, on numerous occasions, the defendant asked Glen Franklin Brewer ("Brewer"), a co-worker, to kill the wife of a friend. However, the description of the residence of the proposed victim matched the defendant's own home. On one occasion the defendant offered Brewer a boat, a motor, and a pickup truck in return for the requested killing. On another occasion the defendant offered Brewer $3,000.00 in return for the killing, and on yet another occasion, the defendant offered Brewer $5,000.00 from life insurance proceeds. The defendant complained to Brewer that his wife was receiving expensive psychiatric treatment and medication and that he feared he would "lose everything he had worked for" if he divorced her. In the fall of 1989, the defendant offered another man, Steven Michael Litz ("Litz"), who was a friend of Thompson, $5,000.00 to kill the defendant's wife because, the defendant said, she was going to divorce him and "take everything he'd ever worked for."

`On the evening of December 3, 1989, the defendant and Thompson took Thompson's 30/30 rifle and went to the home of Dave Robertson ("Robertson"), the defendant's employer, at around 7:30 p.m. After

4

instructing Robertson to tell anyone who asked that he and Thompson had been at Robertson's house until 9:45 p.m., the defendant left with Thompson. The two men drove to an isolated area in Cocke County, Tennessee, near the home of Thompson's uncle. Thompson had previously suggested that location as an out-of-the-way place where the defendant could "get rid of" Mrs. Stephenson. Mrs. Stephenson was lured to the remote location to pick up money for the defendant that was supposedly owed to him for "running" drugs. Thompson and the defendant waited there until Mrs. Stephenson arrived. As she sat in her vehicle, Mrs. Stephenson was shot at close range through the car's windshield. The bullet struck Mrs. Stephenson in the forehead and caused massive head injuries. The defendant told law enforcement officers that Thompson shot the victim, and the State's evidence showed that the defendant offered to give Thompson a truck, a boat, and a motor for killing the victim. Thompson, however, testified that the defendant shot Mrs. Stephenson. Thompson added that, at the defendant's insistence, he also fired the rifle. The two then drove to the defendant's place of work, and the defendant subsequently headed to Ohio in an eighteen-wheeler truck. When Thompson asked about the defendant's children, the defendant told him that they would be all right because his father-in-law would check on them.

On his way out of the state, the defendant met Webb in Harrogate, Tennessee. He informed Webb that "Kathy" had just been killed by some people to whom she owed money. He explained that he and Thompson had gone to the scene of the killing where "Kathy" was found dead. The defendant and Thompson fought there with two men who had killed "Kathy," and they thought that the men were dead. The defendant said that he had not contacted the police because the police were in league with the killers. He told Webb that his children were with "Kathy's" father and commented, "I didn't love her but I'm going to miss the Bitch." [FN] Webb recalled that she was with the defendant the weekend prior to Mrs. Stephenson's murder and that at that time the defendant purchased ammunition for a rifle at a K-Mart store.

[FN: The two young boys were actually left alone at the defendant's house until Mrs. Stephenson's father found them the next day.]

After meeting with Webb, the defendant drove his truck to Ohio. Upon the discovery of his wife's body, the defendant was called back to Tennessee for questioning. The defendant initially denied involvement in his wife's murder. After Thompson and Robertson implicated him in Mrs. Stephenson's

5

death, the defendant confessed to having Thompson kill her. At the time of Mrs. Stephenson's death, the defendant was the beneficiary of a $5,000.00 life insurance policy covering his wife. The defendant's sons, who were teenagers by the time of the resentencing hearing, were adopted by Mrs. Stephenson's parents and had no contact with their father, who, according to his former father-in-law, had never shown any remorse for the killing. At a separate trial, Thompson was convicted of first degree murder and was sentenced to life in prison.

*Stephenson*, 195 S.W.3d at 582-83.

## B. Facts from the Post-Conviction Hearing

The post-conviction court appointed the Office of the Post-Conviction Defender to represent petitioner. Prior to the start of the evidentiary hearing, the court conducted a separate hearing to determine whether petitioner was competent to proceed with his petition. Petitioner had apparently disagreed with counsel's strategy and had attempted to dismiss counsel from further representation. Based primarily on these actions, counsel requested a competency hearing. After hearing expert testimony and having considered its own observations of petitioner throughout the proceeding, the post-conviction court concluded that petitioner was indeed competent to proceed with his petition. The court then gave petitioner the opportunity to proceed with the assistance of counsel or on his own. Petitioner elected to go forward with counsel but waived his right to be present at the evidentiary hearing.

The evidentiary hearing occurred over the course of several days in September 2011. Following the conclusion of the hearing but before the entry of the post-conviction court's order, petitioner seemingly became displeased with the manner in which his attorneys were handling the petition and requested to proceed pro se. Following a hearing, the court granted that request. Petitioner filed a post-hearing brief on his own, but the court also accepted a brief filed by counsel on petitioner's behalf. Following entry of the post-conviction court's order denying relief, petitioner filed a pro se notice of appeal. This court, however, reappointed the Office of the Post-Conviction Defender to represent petitioner in this appeal.

### 1. Competency Hearing

The post-conviction court heard testimony pertaining to petitioner's mental health prior to ruling that he was competent to proceed. Although petitioner does not challenge the court's ruling in that respect, some of the testimony from that hearing is summarized below

for reference in consideration of his claim that counsel was ineffective for not pursuing an adequate defense in mitigation.

Petitioner's mother, Nancy Lemieux, testified that when he was nine years old, he was diagnosed with dyslexia and attention deficit hyperactivity disorder ("ADHD"), for which he was prescribed Ritalin. She stated that she was told that petitioner suffered some mild brain damage possibly during birth. Ms. Lemieux also recalled that petitioner began having seizures when he was about nine months old. She explained that petitioner's father played too roughly with him as an infant.

Dr. Peter Irvin Brown, a forensic psychiatrist, testified on behalf of petitioner. He diagnosed petitioner with a cognitive disorder not otherwise specified and a personality disorder with avoidant and dependent features. According to Dr. Brown, the cognitive disorder impaired petitioner's ability to rationally understand and process information, and the personality disorder affected his ability to regulate his emotions and relate to other people. Dr. Brown found that petitioner had a substantial defect in his executive capacity, i.e., his ability to integrate information from different sources. He attributed that defect to damage in the pre-frontal cortex of the brain, possibly caused by petitioner's father rough-housing with him as an infant. According to Dr. Brown, petitioner had difficulty organizing his thinking: "He vastly overrates his own intellectual capacities, is blind to flaws in his planning and judgment, ignores the advice of people who would help him[,] and[] with an abiding refusal to stop or reconsider, finds himself in a catastrophic situation primarily of his own making." Although Dr. Brown concluded that petitioner was incompetent to proceed with his post-conviction petition, he admitted that petitioner's competency fluctuated according to the circumstances.

Dr. Daniel Malcolm Spica, a clinical neuropsychologist, also testified on behalf of petitioner. He was initially asked to review the results of Dr. Eric Engum, who testified for petitioner during the mitigation phase of the resentencing hearing. Dr. Spica determined, after reading Dr. Engum's report, that additional testing should have been done to ascertain the extent of the damage to petitioner's frontal lobe. Dr. Spica conducted a full neuropsychological exam that included "a slightly more modern battery of neuropsychological tests" that may not have been available to Dr. Engum. Dr. Spica found that petitioner had difficulties with his executive functioning (multi-tasking or thinking about different things at the same time), new learning, and sensory motor speed. Those difficulties, which corresponded to frontal lobe activity, led to a diagnosis of a cognitive disorder not otherwise specified. Dr. Spica surmised that the onset of the damage to petitioner's frontal lobe likely occurred during childhood, possibly in connection with the seizures he experienced. Dr. Spica assessed petitioner's full scale I.Q. at 105, which placed him in the average range. According to Dr. Spica's report:

[Petitioner's] slow sensory motor speed may be directly related to his problems with mental organization; that is, the frontal lobes of the cerebral cortex are believed to mediate both fine motor speed and executive functions. His difficulties with executive control led him to be perseverative in his attempts to solve problems; he continued to attempt methods that had been proven ineffective, without gaining from the experiences of failure. His overall intellectual level is average, with some skills (such as knowledge for general facts) ranking him into the Superior range. It appears likely that [petitioner] over estimates his own mental ability[] and may become both overconfident and overcommitted to his ineffective approaches to solving problems. Psychological testing indicated features of repression, and he appears to view himself in an unrealistic light.

Unfortunately, [petitioner's] mental defects in mental organization and learning likely combine with his problematic personality features during times of stress to cause [him] to feel overwhelmed by information from multiple sources and revert to known - but highly ineffective - behavioral responses to solve problems at hand.

Dr. Spica did not comment on petitioner's competency to proceed with his petition for post-conviction relief.

Drs. Samuel Craddock and Rokeya Farooque evaluated petitioner at the Middle Tennessee Mental Health Institute for approximately twenty-three days. Dr. Craddock, a clinical psychologist, also evaluated petitioner prior to the initial trial in this case. Dr. Craddock did not believe that petitioner had a cognitive or mental disorder, but he was inclined to diagnosis him with a personality disorder not otherwise specified. Dr. Craddock concluded that petitioner had a sufficient understanding of his legal situation to be considered competent. Dr. Craddock also said that petitioner possessed above-average intelligence. According to Dr. Craddock, petitioner's primary concern was being allowed to advance the legal issues that he deemed important. Dr. Craddock suggested that petitioner was possibly his own worst enemy, though, because he refused to listen to the advice of others. However, he could not attribute that "self-defeating" trait to a cognitive impairment or personality disorder.

Dr. Farooque, a forensic psychiatrist, did not diagnose petitioner as having either a cognitive or personality disorder. She testified that both the EEG and CT scan that she administered revealed normal results. Dr. Farooque noted that petitioner had a history of treatment for depression. She concurred with Dr. Craddock's finding of competency. She also testified that petitioner was adamant about having the opportunity to present the legal

8

issues that he included in his petition. The report prepared by Drs. Craddock and Farooque indicated that petitioner

> is willing to work with his legal counsel so long as he [is] given the opportunity to present before the court the claims and issues that are enumerated in his written submissions . . . . [Petitioner] has an adequate understanding of his legal status and pending proceedings. If error exists in [his] understanding of his legal status, it is [our] opinion that the error would not be attributable to a mental disorder. Throughout [his] stay at [MTMHI][,] he did not express delusional beliefs or other signs of symptoms of a mental disorder that might interfere with his ability to represent and defend himself in post-conviction proceedings. His ability to process and analyze information is adequate as is his ability to articulate his reasoning in court and through written word.

The report further indicated that petitioner was polite and cooperative and that his general demeanor and daily habits did not raise the suspicion of a mental illness or other neuropsychiatric disorder.

### 2. Evidentiary Hearing

The several attorneys who have represented petitioner throughout this case testified at the evidentiary hearing. They will be designated herein as: trial counsel (collectively) or trial counsel A and B (individually) (1990 trial and first remand); habeas corpus counsel (1998 habeas corpus proceedings and 2002 resentencing hearing); and subsequent counsel (collectively) or subsequent counsel A and B (individually) (2002 resentencing hearing). Retired District Attorney General Al Schmutzer, Jr., the original prosecuting attorney who handled the case through the 2002 resentencing hearing, also testified.

Mr. Schmutzer testified that a jury was empaneled during the first remand for resentencing but that prior to the start of the hearing, trial counsel approached the State about a plea offer. Mr. Schmutzer informed counsel that he would need to discuss the matter with the victim's father. The victim's father agreed, as long as petitioner was never eligible for parole. Mr. Schmutzer knew that life without the possibility of parole was not an available sentence for petitioner, but he thought that "the Department of Correction[] would probably follow that as long as he didn't complain." Mr. Schmutzer said that they worked out an agreement for life in prison without the possibility of parole for the murder conviction and a consecutive sixty-year sentence for conspiracy, which was outside the applicable sentencing range. According to Mr. Schmutzer, petitioner was aware that he was agreeing to life without parole even though it was not an available sentence and that the sixty-year

9

sentence was outside of the applicable range of punishment. Petitioner stated several times that he did not want to spend another day on death row. Mr. Schmutzer testified that prior to being approached by trial counsel, the State was, in fact, prepared to pursue the death penalty again.

Mr. Schmutzer recalled that he moved to sever the trials of petitioner and his co-defendant because they each gave statements implicating the other as the shooter. During each trial, the State introduced each defendant's statement into evidence. Mr. Schmutzer stated, however, that the State did not have a theory as to who actually pulled the trigger. Nor did he recall making any argument to the jury in Thompson's case suggesting that petitioner was the actual shooter. Mr. Schmutzer testified that he "[didn't] try people on theories." Instead, he said, "The inconsistencies came from the facts as presented by the two defendants and the way they confessed." However, he did not believe being unable to identify the actual shooter made a difference in the State's case.

Habeas corpus counsel testified that he was appointed by the supreme court to represent petitioner in his habeas corpus appeal challenging the validity of his sentence of life without parole. Subsequently, habeas corpus counsel was retained by petitioner's family for the resentencing hearing. He joined subsequent counsel A and B, who were appointed by the court. Habeas corpus counsel identified subsequent counsel as lead counsel. He recalled that he was primarily responsible for identifying the appropriate legal arguments while subsequent counsel focused on the presentation of mitigation.

Habeas corpus counsel described his involvement in petitioner's resentencing proceedings. He stated that he believed that petitioner's statement to the police prior to his arrest was crucial in providing probable cause for the issuance of the arrest warrant. He moved to suppress that statement at the resentencing hearing on Fourth Amendment grounds because the police unlawfully detained petitioner prior to his arrest. Although the supreme court already ruled that the admission of petitioner's statement did not violate either the Fifth or Sixth Amendments, habeas corpus counsel believed that a Fourth Amendment argument was viable because evidence secured in violation of the Constitution should not be admitted in capital sentencing hearings. His motion to suppress was denied by the trial court, and both appellate courts held that the issue was waived because the issue was not raised in the first motion to suppress before the original trial.

Prior to the resentencing hearing, habeas corpus counsel did not request specific performance of the plea bargain that was meant to keep petitioner off death row. Nor did he request that the State be estopped from seeking the death penalty again. He remembered some discussion about a vindictiveness claim, but it was never raised. He failed to argue that the imposition of the death penalty following resentencing was arbitrary. He testified,

however, that a plea agreement involving life in prison plus sixty years would have had the practical effect of ensuring that petitioner remained in prison for the rest of his life. Habeas corpus counsel did not recall participating in any plea negotiations prior to the resentencing hearing.

Habeas corpus counsel testified that the defense sought to prove that petitioner shot the victim to negate the "murder for hire" aggravating circumstance. He read this court's opinion in co-defendant Thompson's case, but he did not read the State's brief. He testified that his primary focus with respect to the co-defendant's case was developing a disproportionate sentencing argument on appeal.

Trial counsel A and B were appointed to represent petitioner at the original trial and during the first resentencing hearing after remand in 1994. Trial counsel A had been practicing law for twenty years at the time of his initial appointment. He testified that petitioner denied killing the victim. He could not recall why a Fourth Amendment argument was not advanced in their motion to suppress petitioner's statement. Trial counsel A stated that after the first remand, counsel engaged the prosecution in plea negotiations. According to trial counsel A, their goal was to have petitioner transferred from death row, while the State's goal was to ensure that petitioner never left prison.

Trial counsel B testified that he had been practicing law less than two years when he was first appointed to this case. He did not recall any strategic reason why they did not advance a Fourth Amendment argument in their motion to suppress petitioner's statement. He did not remember whether they opposed the State's motion to sever the two cases. Trial counsel filed a motion to exclude mention of the victim's insurance policy. Trial counsel A recalled that as part of the sentencing plea negotiations on remand, the State required petitioner to admit his guilt to the convictions. Trial counsel A testified that the sixty-year sentence for the conspiracy conviction was necessary to ensure that petitioner remained in prison in the event that the sentence of life without parole was later ruled invalid. He did not recall any discussions about whether the same goal could have been reached with a life sentence.

Subsequent counsel were appointed to represent petitioner during the 2002 resentencing hearing. Subsequent counsel A was appointed as lead counsel, and he focused on developing mitigation evidence. Counsel were assisted by an investigator, a mitigation specialist, and a mental health expert, Dr. Engum. Subsequent counsel A testified that they had access to the files of former counsel in the case. He recalled there being "two totally different opinions" about petitioner's mental health issues. Subsequent counsel A said he was aware of the issues mentioned by Dr. Brown. He was also aware of the problems that

petitioner's mother had with depression and of his father's constant absence from the home due to his military service.

According to subsequent counsel A, petitioner had unrealistic expectations concerning any plea negotiations in that the most he was willing to accept was a twenty-five-year sentence. After reviewing Dr. Engum's evaluation, subsequent counsel said that they did not consider employing another expert because he had used Dr. Engum before and maintained confidence in his work. Subsequent counsel A testified that the defense considered both mitigation tactics but ultimately decided that the best way to save petitioner's life was to show the jury that he was rehabilitated and was an asset, rather than a danger, to the prison community because they had concerns about being able to convince the jury that petitioner's social and medical backgrounds were sufficient mitigation.

Subsequent counsel A believed that if they proved that petitioner fired the fatal shot, then the "murder for hire" aggravating circumstance would not apply. The defense requested an instruction to that effect but did not raise the issue on appeal. According to subsequent counsel A, he deferred to subsequent counsel B regarding the issues to present on appeal. However, subsequent counsel A testified that they all discussed which issues they thought would represent the strongest arguments. He acknowledged that the better practice in capital cases is to raise as many issues on appeal as possible. He read the transcript of Thompson's trial, but he did not read the appellate opinion or briefs of the parties.

Subsequent counsel A deferred any questions about which jurors to keep or strike to subsequent counsel B because subsequent counsel B was from Cocke County and was more familiar with the character of the venire. Subsequent counsel B testified, though, that they did not exercise all of their peremptory challenges because they feared there was a "substantial chance" they could end up with someone less favorable on the panel.

Subsequent counsel B testified that defense counsel did not seek to enforce the essence of the previous plea agreement in which the State agreed to remove the death penalty from consideration. He stated that they used a jury questionnaire and ranked prospective jurors based upon their responses to the written questionnaire as well as the questions asked during individual voir dire. Subsequent counsel B recalled one juror asking the court before deliberations how long the defendant would have to serve on a life sentence. He also recalled requesting that the court inform the jury about the sixty-year sentence petitioner already had.

According to subsequent counsel B, the defense sought any information in the State's possession concerning who fired the fatal shot because their theory was that the State could not satisfy the "murder for hire" aggravator if they could prove petitioner actually shot the

victim. Subsequent counsel B testified they even requested an instruction to that effect. He, however, did not remember reviewing the appellate briefs or opinions in Thompson's case. He did not recall making any argument about whether the victim's life insurance had lapsed prior to the murder.

Dr. Brown testified again during the evidentiary hearing. Dr. Brown's evaluation addressed whether petitioner suffered from a mental disease or defect at the time of the offense that substantially impaired his judgment. As noted above, Dr. Brown opined that petitioner suffered from a cognitive disorder not otherwise specified and a personality disorder with avoidant and dependent features. He determined that the combination of those two disorders substantially affected petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law at the time of the crime. Dr. Brown testified that petitioner's ability to make rational decisions was adversely affected by stress. He also concluded that petitioner's disorders caused him to lie to Julia Webb. Similarly, according to Dr. Brown, the disorders contributed to the indiscriminate manner in which petitioner solicited assistance in killing his wife. Dr. Brown testified that petitioner's behavior could be characterized by the adage, "[Y]ou have to be able not only to talk the talk but walk the walk. For [petitioner], there's no such thing as a walk. He equates being successful at something with being able to talk about it." As such, Dr. Brown said petitioner had a fear of failure. He stated that petitioner tended to exaggerate his intelligence so that he appeared to be in control of the situation, even though his ultimate decisions might be unreasonable. However, Dr. Brown did not believe petitioner was capable of manipulating others to get his way.

Dr. Brown distinguished between pleasant people with mental illnesses and "jerks": "The studies show that bad behavior, criminal behavior, insensitive behavior, is found in equal proportions in psychiatric patients [and] people who don't have a psychiatric illness. But being a jerk is not a psychiatric condition." Dr. Brown did not believe that petitioner fell in the latter category, and he did not diagnose petitioner with an antisocial personality disorder. Dr. Brown's report reflected that petitioner functioned well in prison and that he had no serious disciplinary problems. The report further noted:

> The testing and history demonstrate marked impairment in the cognitive abilities relating to appropriate planning and the capacity to control his behavior in challenging or stressful situations. He has functioned well whenever he is in a highly structured and low conflict situation. When the rules are clear and unambiguous and the environment places minimal demands on judgment he has done extremely well (e.g. as a long-distance truck driver and while an inmate).

13

The available information concerning the time of the offense shows extraordinarily poor judgment and planning actions, even by the standards of the average criminal. Both his planning and attempts to conceal those plans were obviously deficient. While he fantasized aloud about having his wife killed, his attempts to follow through were limited to making inquiries in his circle of friends. In ordinary circumstances it would not be unreasonable to expect her to be alerted by one of the many people he told. Secondly, he created a substantial number of people who could later testify that he had talked about killing his wife and offered money or goods. Finally, far from hiring someone to commit the crime, he instead settled on committing the crime himself while bringing along a younger friend who had a history of being easily influenced by [petitioner]. Rather than being a killing for hire the effective result was an eyewitness to his commission of the crime. In retrospect every step that [petitioner] took simply served to make it relatively simple to unravel his modest alibi.

[Petitioner] meets criteria for personality disorder with mixed avoidant and dependent traits on the basis of consistent and pervasive patterns of impaired social function with a fear of failure that prevents him from making appropriate academic or educational efforts (e.g. failing in military basic training and withdrawing from community college); and an excessive need to appear more confident or capable than he actually is (e.g. his efforts to convince others of [his] superior legal talents.) His insistence is often against his own best interests, in this instance spectacularly so, and a maladaptive and excessive need to obtain help and assistance from others in times of emotional distress (e.g. feigning illness in an attempt to obtain emotional support, offering multiple excuses for his failures in the military or school and, most significantly[,] insisting that a friend accompany him during the event in question).

He does not meet criteria for antisocial personality disorder.

Significant weight must be placed on evidence of impaired judgment and planning as evidenced by the neuropsychological testing and the psychiatric history dating back to infancy.

Put in perspective, he shows evidence of significant mental disorganization and difficulties with comprehending the significance of spoken interactions with others as evidenced by both the history and the deficits noted in testing results . . . . This is especially so under time or emotional pressures. He is

14

largely unaware of the difficulty and will tend to overrate his own abilities. This is consistent with his belief that he has a special understanding of the law related to his case and for his belief that anyone who disagrees with him is either ill-informed or dishonest. He is also impaired in his ability to recognize when he is making mistakes and to make changes in his plans when they fail.

These difficulties are consistent with the reports of the people who knew and worked with him at the time: that he was a serial exaggerator, blithely self-confident and given to bizarre and needlessly complex stories (e.g. the woman who[m] [he] is living with was not his wife but her crazy sister).

His difficulties are also consistent with his spectacularly maladroit conspiracy. He repeatedly offered to pay several friends to kill his wife, regardless of their persistent lack of interest. He made no attempts to "cover his tracks" when he was rebuffed. The net result was a half-dozen witnesses who could report of his repeatedly stated intent to have his wife killed.

Secondly, when he was unable to hire anyone, he committed the act himself (as stated in the appellate court's opinion in the *Thompson* case). Instead of leaving the act to a hired killer he went himself while bringing along a younger and impressionable friend whose only effective contribution was to provide an eyewitness placing him at the crime scene.

Taken together the history is one of an individual with substantial impairment in judgment and planning who was unable to cope with the steady and progressive deterioration of his most significant relationship. The sequence of events shows evidence of impaired planning, an inability to foresee negative consequences and an inability to prepare reasonable precautions to evade detection.

Further, his failures in judgment were compounded by a social environment that did nothing to restrain or prevent his repeatedly announced plan. In fact, he appears to have spent most of his time with close associates who were not significantly bothered by talk of "getting rid" of a spouse. It is significant that so many people were later able to testify as to his repeated intentions to have his wife killed. It is equally significant that none of them made any significant attempt to dissuade or prevent him over a period of many months. Given his extreme reliance on the approval and support of others, it is more likely than not that he interpreted this general silence as more than tacit approval. It is

also more likely than not that, given his impulsivity and impairments in judgment and planning, he was unable to "back down" or reconsider.

Finally, his planning was not merely ineffective, it was grossly counterproductive. Without his persistent efforts it is more likely than not that law enforcement would have had a much more difficult time solving the crime.

In the first place, the obvious purpose of murder for hire is to distance the individual from the crime. Secondly, the purpose of premeditation is to organize an effective plan that includes method and timing to achieve the goal. Typically, this also means taking effective steps to evade detection, before and after commission of the crime.

Instead, he settled for dragging along an, at best, unwilling accomplice who thereby became an eyewitness to his involvement in the crime. In the second place, his preparations consisted of providing witnesses capable of testifying to his frequently repeated stated intent, his having the murder weapon, purchasing bullets and of his whereabouts and schedule for the night in question. Finally, he provided his fiancée, who appears to have been in complete ignorance of his actual circumstances, with a simply incredible explanation for his wife's death at the hands of unknown assailants. In the end he produced a panoply of virtually every kind of evidence of his direct involvement.

Based on the evidence presented at the hearings, the post-conviction court denied petitioner relief by written order. Relevant excerpts from the order will be discussed below in the context of the issues presented.

## III. Analysis

### A. Burden of Proof and Standard of Review

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). As our supreme court held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct

17

from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

When reviewing claims of ineffective assistance of counsel, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. Additionally, courts will defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). We note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Id.* at 785.

With regard to the second prong of the *Strickland* analysis, to prove that petitioner suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, petitioner must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). Similarly, petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695).

## B. Issues

### 1. Plea Agreement

In this appeal from the denial of post-conviction relief, petitioner demands specific performance of the previous plea agreement with regard to the State's concession not to seek

the death penalty. He contends that because the State reaped the benefit of the sixty-year sentence and promised to forgo seeking the death penalty, the State was in breach of its promise by seeking the death penalty at the resentencing hearing.

The complex procedural history of this case is outlined above. During the first remand in 1994, the parties negotiated an agreement to ensure that petitioner would remain in prison for the rest of his life. The victim's family assented to the State's proposal to forgo another capital sentencing hearing if the State could assure them that petitioner would never be eligible for parole. Petitioner was motivated by his desire to be transferred from death row. Accordingly, petitioner agreed to an out-of-range sentence for the conspiracy conviction and agreed to a sentence of life in prison without the possibility of parole for the murder conviction. All parties acknowledged that the validity of a life without parole sentence could be questioned. According to petitioner's current argument, however, the sixty-year sentence for conspiracy was "the crux" of the deal for the State in exchange for removing the death penalty from consideration.

The post-conviction court concluded that petitioner's claim for specific performance is waived because he failed to pursue the issue during the resentencing proceedings. We agree. The Post-Conviction Procedure Act provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented . . . ." Tenn. Code Ann. § 40-30-106(g). Petitioner sought and was granted habeas corpus relief as to the legality of the life without parole sentence for first degree murder. *Stephenson*, 28 S.W.3d at 912. He was resentenced and again appealed the imposition of the death penalty. *Stephenson*, 195 S.W.3d 574. The appropriate time to advance his claim that the State breached the terms of the plea agreement was during the resentencing hearing and the appeal therefrom. Accordingly, because petitioner failed to present his claim at the appropriate time, the issue is waived for purposes of post-conviction review.

Alternatively, petitioner argues that waiver of the issue is attributable to the ineffective assistance of counsel. He maintains that his attorneys at the resentencing hearing should have objected to the State's notice of intent to seek the death penalty again and should have requested specific performance of the State's agreement to forgo the death penalty. The post-conviction court determined that counsel's performance was deficient in that respect but otherwise concluded that petitioner was unable to demonstrate prejudice.

Our analysis of this issue entails a review of the remedies available for breach of a plea agreement. In that regard, our supreme court has set forth the following guidance:

Some courts, in addressing breach of plea agreements, have applied principles of contract law to construe the agreement and determine the appropriate remedy. *See*, *e.g.*, *United States v. Ready*, 82 F.3d 551, 556 (2d Cir. 1996); *United States v. Giorgi*, 840 F.2d 1022, 1025 (1st Cir. 1988); *United States v. Verrusio*, 803 F.2d 885, 886 (7th Cir. 1986); *United States v. Calabrese*, 645 F.2d 1379, 1390 (10th Cir. 1981). The courts of this state have taken a similar approach. *See State v. Howington*, 907 S.W.2d 403, 407-08 (Tenn. 1995). The general rule has been that where an agreement is accepted and later breached, the remedy for the breach is either specific performance or restoration of the parties to the status existing immediately before the plea was entered. *See Harris v. State*, 875 S.W.2d 662, 666 (Tenn. 1994); *State v. Turner*, 713 S.W.2d 327, 329 (Tenn. Crim. App. 1986); *Metheny v. State*, 589 S.W.2d [943] at 945 [(Tenn. Crim. App. 1979)].

We note, however, that a defendant's rights relative to a plea bargain are grounded in more than contract; contract principles, while useful, do not completely define the obligations of the parties. "'Plea agreements . . . are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain.'" *United States v. Ready*, 82 F.3d at 558 (quoting *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir. 1992)); *see also United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986) (the defendant's underlying "contract" right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law).

Since *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), Tennessee courts have held that where the State breached a plea agreement, or some other infirmity occurred that was not caused by the defendant, but which invalidated the agreement, the remedy for breach was to allow the defendant to choose either specific performance or withdrawal of the plea. *Goosby v. State*, 917 S.W.2d 700, 707 (Tenn. Crim. App. 1995); *see also Harris v. State*, 875 S.W.2d at 666-67; *State v. Turner*, 713 S.W.2d at 329; *Metheny v. State*, 589 S.W.2d at 945. We have not previously had the opportunity to address the situation where it was the defendant, not the State, who breached a plea agreement. In other jurisdictions, however, it appears that the same options remain available[;] the State has the option either to specifically enforce the agreement or to rescind the plea agreement. *See State v. Thomas*, 79 Wash. App. 32, 899 P.2d 1312, 1315 (1995), and the cases cited therein.

*State v. Mellon*, 118 S.W.3d 340, 346 (Tenn. 2003).

20

Following the first remand in 1994, petitioner agreed to two sentences that he and his attorneys knew were outside the range that the jury and trial court could have imposed. His goal, however, was to be transferred from death row. Apparently dissatisfied with the resulting sentence, petitioner successfully argued to the supreme court that his life without parole sentence was illegal. Although he initiated the habeas corpus proceeding pro se, the supreme court appointed habeas corpus counsel to assist him on appeal. According to the supreme court, the legislature specifically intended that the life without parole sentencing option would only be available for those defendants who committed the offense of first degree murder on or after July 1, 1993. *Stephenson*, 28 S.W.3d at 912. The court thus held that petitioner's sentence was illegal and void, "notwithstanding the agreement between the parties." *Id.* Petitioner did not complain about his sixty-year sentence when he filed his habeas corpus petition attacking the life without parole sentence. Importantly, the supreme court affirmatively stated that its decision did not affect the validity of the separate sixty-year sentence for conspiracy that, it concluded, was not void or illegal. *Id.* at 612 n.3. Accordingly, when subsequent counsel were appointed to represent petitioner during resentencing in 2002, the supreme court had already addressed the legality of the sentences that stemmed from the plea agreement for the murder.

Upon our review, we conclude that the State did not breach the terms of the plea agreement. Petitioner is the party who sought annulment of the agreement. The State upheld its obligation under the agreement, and according to Mr. Schmutzer, "[T]he Department of Correction[] would probably follow [the agreement of life without parole] as long as [petitioner] didn't complain." In addition, based upon petitioner's actions, the supreme court agreed that life in prison without the possibility of parole was not an available sentence in this case. Accordingly, on remand, petitioner faced either life with the possibility of parole or the death penalty.

The record reflects that the State never agreed to recommend a sentence of life *with* the possibility of parole.[1] The State was prepared to pursue the death penalty again after the initial remand until petitioner initiated plea negotiations. The State agreed to a sentence of life *without* the possibility of parole, which was the only way to ensure that petitioner would never be released from confinement. That sentencing option, however, was no longer available during the second remand. Petitioner argues that the State should be required to adhere to the intent of the original agreement, which, according to him, was that the State

---

[1] We note that in Tennessee, there is no such sentence as life in prison with the possibility of parole. *See* Tenn. Code Ann. § 39-13-202 (c) (noting that the possible sentences for first degree murder are death, life imprisonment without the possibility of parole, and imprisonment for life). However, we have employed this language to highlight the distinction between life in prison without the possibility of parole and a life sentence.

21

would abstain from seeking the death penalty. Petitioner contends that the sixty-year sentence for the conspiracy conviction, which was out of range but agreed upon by petitioner, was part of the original agreement to ensure that he remained in prison for the rest of his life. Accordingly, he posits, because that sixty-year sentence remains in effect, the State received the benefit of the bargain and thus should not have been permitted to seek the death penalty again. However, the State counters that even consecutive sentences of life and sixty years cannot not guarantee that petitioner will never be released from prison because he would eventually become eligible for parole under the applicable sentencing laws, albeit at a very advanced age. Nevertheless, because the State did not offer a life sentence, specific performance of the original agreement was no longer an option, and the parties were restored to their position prior to the sentencing plea for the murder.

Contrary to petitioner's argument, the State cannot be forced to agree to a life sentence merely because petitioner successfully challenged the legality of the life without parole sentence. As our supreme court has explained:

> Since . . . the State is not constitutionally limited or bound by its initial formal charge, the State certainly is not limited or bound, as the defendant argues, by a plea offer [that] was rejected by the defendant. When a plea is rejected, the State may prosecute a defendant to the fullest extent of the law and seek the most severe punishment available under the law. *Cf. State v. Hines*, 919 S.W.2d 573 (Tenn. 1995) (upholding a trial judge's refusal to approve a plea bargain agreement [that] resulted in the case going to trial in which the defendant was sentenced to death); *Parham v. State*, 885 S.W.2d 375, 381 (Tenn. Crim. App.), *perm. app. denied*[] (Tenn. 1994) (guilty plea is not involuntary by the fact that the accused is faced with an election between possible death sentence on a plea of not guilty and a lesser sentence upon a guilty plea). To hold, as the defendant urges, that the State can pursue no greater charge or seek no greater punishment than that offered during plea negotiations could effectively abolish the practice of plea bargaining in first degree murder cases. Prosecutors would rarely, if ever, be willing to make an offer of leniency in exchange for a guilty plea. We decline to adopt such a radical and far reaching principle.

*State v. Mann*, 959 S.W.2d 503, 510 (Tenn. 1997). This case presents a similar scenario. Although petitioner did not reject the plea, he nonetheless nullified it by pursuing habeas corpus relief. We equate petitioner's successful challenge to the original sentencing plea with a *de facto* rejection of the plea offer.

22

Our supreme court has held:

Plea negotiations often give rise to difficult choices for a defendant. Indeed, "[t]he criminal process . . . is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." [*Corbitt v. New Jersey*, 439 U.S. 212, 220, n.8 (1978)] (internal citations and quotations omitted). In this case, the defendant was faced with the choice of pleading guilty and being sentenced to life imprisonment or exercising his constitutional right to a jury trial, and facing the broad spectrum of possibilities, including, on the one extreme, an acquittal of all charges, and on the other extreme, conviction for first degree murder and imposition of the death penalty. [The defendant] decided to exercise his constitutional right to a jury trial, and he must now accept the consequences of that choice.

*Id.* at 511. Similarly, petitioner elected to challenge the sentence that resulted from the plea agreement. The State took no action to contest the validity of the sentences. Petitioner states that his position now is less desirable than it was prior to the plea agreement because the sixty-year sentence remains in effect. While that may be true, the State was within its rights to pursue capital punishment during resentencing.

Accordingly, we conclude that petitioner has failed to demonstrate how his counsel's performance was deficient. Original trial counsel negotiated an agreement to have petitioner transferred from death row. Although all parties acknowledged that the agreement was novel, the negotiated agreement benefitted petitioner at the time. At the resentencing hearing, subsequent counsel were aware that the only remaining sentencing possibilities were life with the possibility of parole and the death penalty. The State was unwilling to agree to a life sentence. Counsel testified that petitioner had "unrealistic expectations" concerning the plea negotiations. Subsequent counsel A testified that petitioner would not agree to any sentence longer than twenty-five years. Despite the concessions by counsel during the evidentiary hearing that they should have sought specific performance, their conduct cannot be deemed objectively unreasonable in this situation. Moreover, because the resentencing hearing was conducted in accordance with the statute and because petitioner has not proven that the State would have agreed to a life sentence, he cannot show prejudice. Petitioner is not entitled to relief on this claim.

## 2. Aggravating Circumstance

Petitioner was sentenced to death on the finding of one aggravating circumstance: "The defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration." Tenn. Code Ann. § 39-13-204(i)(4). Petitioner contends that the jury's finding of this circumstance cannot stand, based on the sufficiency of the evidence presented. As the State correctly notes, the supreme court affirmed the jury's sentence of death in this case, specifically determining that the evidence was sufficient to support the sole aggravating circumstance and that the evidence was also sufficient to support the finding that it outweighed the mitigating evidence. *Stephenson*, 195 S.W.3d at 593-94. Thus, this claim has been previously determined as defined by the Post-Conviction Procedure Act. Tenn. Code Ann. § 40-30-106(h); *see also Workman v. State*, 868 S.W.2d 705, 711 (Tenn. Crim. App. 1993) ("It has long been established in this jurisdiction that a petitioner may not litigate the sufficiency of the evidence in a post-conviction suit.").

Petitioner also argues that his attorneys were ineffective in their defense of the sole aggravating circumstance. He contends that counsel's failure to identify statements in the State's brief on appeal in the Thompson case, as well as in this court's opinion, deprived him of evidence establishing that the State previously admitted that petitioner, not Thompson, killed the victim. In addition, he asserts that counsel failed to present an argument similar to the one he advances now, mainly that the "murder for hire" aggravating circumstance requires proof of three distinct elements.

At the resentencing hearing, subsequent counsel introduced evidence to the jury to suggest that petitioner was the actual shooter, or, in the alternative, that the State could not affirmatively prove who shot the victim, thus attempting to bolster their argument that the State did not establish the elements of the "murder for hire" aggravating circumstance beyond a reasonable doubt. Petitioner points out that this court summarized the trial evidence in Thompson's direct appeal and intimated that petitioner killed the victim himself, *Ralph Thompson, Jr.,* 1992 WL 322404 at *1-2, and that the State's brief in that case contained a similar summary. This evidence, he suggests, could have been utilized by subsequent counsel in negating the "murder for hire" aggravator.

The post-conviction court correctly noted:

[T]he appellate court and the State on appeal were merely summarizing the admissible evidence in a discussion of the sufficiency of the evidence in the Thompson case. It would have been inappropriate to refer to evidence [that] had not been admitted against Thompson[,] such as the Petitioner's statement.

24

Such a summary of evidence by a court does not take into account all possible interpretations of the evidence but views the evidence in a light most favorable to the State to determine if the evidence is sufficient. The State had been limited by the rules of law and the statements of Thompson as to what could be admitted in Thompson's trial and what they could argue to the jury about how the offense occurred. The record clearly indicates that the State argued that while the jury could never be sure who the shooter was[,] the Petitioner and Thompson had both played an integral role in the victim's death and that the Petitioner had offered to pay Thompson with a boat, motor, and truck for his help in getting rid of the victim.

Although petitioner argues that subsequent counsel failed to utilize the State's brief and this court's opinion in the Thompson case to bolster the defense, the State correctly notes that petitioner has not cited any rule of law that would have allowed those items to be submitted to the jury. Nevertheless, counsel sought to introduce into evidence a portion of the State's closing argument from the Thompson case, requested a special jury instruction that the "murder for hire" aggravator could not apply to someone who was both the employer and the triggerman, and moved to dismiss the State's notice of intent to seek the death penalty because it could not prove who shot the victim. The trial court denied those requests. Thompson testified for the defense that petitioner shot the victim. Because petitioner's guilt had been proven, counsel argued this point to the jury in support of the position that if petitioner pulled the trigger, then he could not be sentenced to death under the terms of the "murder for hire" aggravating circumstance. Habeas corpus counsel testified that he read this court's opinion in the Thompson appeal, and subsequent counsel A read the entire transcript of that trial. The record reflects that counsel diligently pursued their defense strategy. We agree with the post-conviction court and conclude that the representation petitioner received was not deficient in this respect.

Petitioner also claims that counsel were ineffective because they did not argue that the "murder for hire" aggravating circumstance required three distinct elements that the State must have proven. He posits that those elements are: "(1) the murder was preceded by an agreement to commit murder for hire; (2) the agent/employee to the contract performed the actual killing; and (3) the agent/employee was motivated by the promise of compensation." There is no controlling legal authority, however, mandating the interpretation advanced by petitioner. Thus, counsel could not reasonably be expected to make such an argument. Moreover, as the post-conviction court observed, the plain language of the aggravating circumstance does not warrant such an interpretation. The jury was only required to find that petitioner employed another to commit the murder. *See* Tenn. Code Ann. § 39-13-204(i)(4). Accordingly, counsel's failure to make such an argument was not objectively unreasonable.

25

Moreover, prejudice cannot be shown because, as discussed above, the evidence reasonably supports the inference that petitioner hired Thompson and that Thompson shot the victim.

### 3. Statement to Police

Petitioner challenged the admission of his confession in his original direct appeal claiming that it was taken in violation of the Fifth and Sixth Amendments. He advanced several arguments in support of his position:

(1)   his intoxication and emotional condition prevented a knowing, intelligent[,] and voluntary waiver of his right to remain silent;

(2)   the officers influenced his decision by coercion;

(3)   his rights were violated by the failure of law enforcement officers to inform him that an attorney, employed by his father, was present at the sheriff's department and asking to see him; and

(4)   he invoked his right to counsel.

*Stephenson*, 878 S.W.2d at 542. The supreme court concluded, however, that the trial court did not err in denying his motion to suppress his statements to the police. *Id.* at 544-48. On direct appeal from the resentencing hearing, the Petitioner advanced an additional argument, that his statements were taken in violation of the Fourth Amendment, i.e., that he was detained at the station without probable cause. The supreme court held that the issue was waived because petitioner did not raise it prior to trial. *Stephenson*, 195 S.W.3d at 592. Accordingly, any attempt to re-litigate the merits of that claim in these proceedings must fail.

Petitioner also argues that trial counsel were ineffective for failing to present the additional Fourth Amendment argument prior to trial. The State argues that petitioner's claim against trial counsel is waived. *See* Tenn. Code Ann. § 40-30-106(g). We agree.

As noted in our review of the procedural history of this case, petitioner filed a petition for post-conviction relief in 1995, then later, on advice of counsel, voluntarily withdrew his petition. The instant post-conviction action was not initiated until 2006. The 1995 post-conviction petition would have been the proper vehicle for challenging the effectiveness of his trial counsel. Because he elected to withdraw that petition, he has waived review of the issue he now advances. *Id.* Petitioner's convictions were affirmed in 1994. All subsequent proceedings have pertained to sentencing. As the supreme court ruled when it addressed this claim in 2006, "The fact that [petitioner's] sentence was overturned on appeal does not

provide him with a second opportunity to litigate pre-trial issues that could have been raised before his original trial." *Stephenson*, 195 S.W.3d at 592. Similarly, the fact that petitioner withdrew his first post-conviction petition and later successfully pursued habeas corpus relief does not grant him the opportunity now to raise a pre-trial claim that could have been raised in the first post-conviction petition. Petitioner is not entitled to relief on this claim.

### 4. Inconsistent Theories

Petitioner contends that the State violated his due process rights by pursuing inconsistent theories at his trial and sentencing hearing and at the trial of his co-defendant. His argument is rooted in the statements made by the State in its brief in Thompson's direct appeal suggesting that petitioner was the shooter. Petitioner also couches this argument in terms of ineffective assistance of counsel.

Petitioner adheres to his position that the identity of the triggerman was central to the State's ability to prove the "murder for hire" aggravating circumstance. Accordingly, he contends that the State violated his due process rights by arguing different theories at the two trials. As the post-conviction court noted, however, Mr. Schmutzer testified that the State did not have a theory as to who actually pulled the trigger. Mr. Schumtzer said that he "[didn't] try people on theories;" instead, he relied on "the facts as presented by the two defendants and the way they confessed." Accordingly, at each trial, the State introduced each defendant's statement against him. As the post-conviction court observed:

> The evidence established that the same week as the murder the Petitioner and Co-defendant Thompson gave incriminating statements to law enforcement in which each admitted to being present but claimed that the other did the actual shooting. Two other witnesses testified to the Petitioner's attempts to hire them to commit the murder. The Petitioner's girlfriend testified that she had gone out of state with the Petitioner during the middle of the night once and taken his father's boat without speaking to his father and that the Petitioner had stored the boat at her home. A life insurance policy for $5000 on the victim's life existed and was still in the grace period for payment to which the Petitioner was the beneficiary. $5000 was the amount offered at one point for the murder.

> At the Petitioner's re-sentencing hearing in 2002 and Thompson's trial, all of the evidence mentioned above was introduced. The substance of [the Petitioner's] statement was not introduced at Thompson's trial but the fact that [the Petitioner] had made a statement was. At the 1990 trial of the Petitioner, Thompson's statement was not introduced but the fact that he had made a

27

statement was introduced to show its [e]ffect on the Petitioner and how he changed his statement when he found this out. At the 2002 re-sentencing hearing, Ralph Thompson was called as a witness by the defense and he was asked in detail about his statement and it was admitted into evidence along with the Petitioner's own statement.

In proceedings against both Thompson and the Petitioner, the State argued that the Petitioner was looking for someone to kill his wife and that Thompson had been helping him look. When two other people had refused to take the job, the Petitioner had offered to give Thompson a boat, motor, and truck to help him get rid of his wife. The Petitioner's own statement discussed the agreement to give these things to Thompson in exchange for his help. In both cases, the State told the jury that they would never know who the triggerman was and that it did not matter. Thompson suggested the location of the murder and provided the weapon. Thompson went with the Petitioner[,] and they were to be each other's alibi. Thompson cleaned and hid the murder weapon at his home. In both cases, the State argued that Thompson and [the Petitioner] had both played an integral part in the murder and that it did not matter who had actually been the shooter.

We agree with the post-conviction court's conclusion that the State did not present "core" inconsistencies. "Although our supreme court has recognized the possibility that pursuit of inconsistent theories at the separate trials of co-defendants may have due process implications, the court has steadfastly declined to adopt the rule of *Smith v. Groose,* 205 F.3d 1045 (8th Cir. 2000), that ''core' inconsistencies violate Due Process guarantees.'" *Berry v. State*, 366 S.W.3d 160, 182-83 (Tenn. Crim. App. 2011) (citing *State v. Housler,* 193 S.W.3d 476, 492 (Tenn. 2006) and *State v. Robinson,* 146 S.W.3d 469, 496 n. 13 (Tenn. 2004)). The supreme court has elaborated:

We agree that "prosecutors must not present proof of an historical narrative that they know not to be true[,]" *United States v. Siriprechapong*, 181 F.R.D. 416, 422 (N.D. Cal. 1998) (summarizing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny), but we also recognize that "prosecutors are not omniscient." *Thompson v. Calderon*, 120 F.3d 1045, 1071 (9th Cir. 1997) (Kozinski, J., dissenting). Just as important, prosecutors are not finders of fact. When a prosecutor has conflicting evidence or simply does not know the truth, he "is entitled to retain skepticism about the evidence he presents and trust the jury to make the right judgment." *Id.*; *see also id.* at 1074-75 (Kleinfeld, J., dissenting) ("The jury is supposed to decide the case based on the evidence and the judge's instruction. . . . It is up to the jury, not

28

the prosecutor, to decide what happened amidst a lot of lies.") In sum, we think the words of Justice Thomas in his *Bradshaw* [*v. Stumph*, 125 S.Ct. 2398 (2005),] concurrence apply aptly to this case:

> The Bill of Rights guarantees vigorous adversarial testing of guilt and innocence and conviction only by proof beyond a reasonable doubt. These guarantees are more than sufficient to deter the State from taking inconsistent positions; a prosecutor who argues inconsistently risks undermining his case, for opposing counsel will bring the conflict to the factfinder's attention.

125 S.Ct. at 2410.

*Housler*, 193 S.W.3d at 493. Moreover, "[a]s a practical matter, discrepancies are commonly unavoidable when several individuals are prosecuted in separate trials for the same offense." *Robinson*, 146 S.W.3d at 497.

Both petitioner and his co-defendant played integral roles in the death of the victim. Each stated that the other pulled the trigger. Consequently, the prosecution had two versions of the killing and thus presented the statement of each defendant at his own trial. Nevertheless, either as a principal or under a theory of criminal responsibility, both defendants were equal participants in the crime, and both were guilty of first degree murder. Mr. Schmutzer admitted he did not know who pulled the trigger. Despite statements by the State in its brief in Thompson's direct appeal, Mr. Schmutzer testified that he never argued to the jury in either case who he believed pulled the trigger.

During the resentencing hearing, the State introduced petitioner's own statement in which he said Thompson shot the victim, and, in an admitted attempt to create reasonable doubt, defense counsel introduced Thompson's statement in which he said that petitioner shot the victim. However, the "core" theory of the two prosecutions was the same; namely that petitioner hired Thompson to kill his wife. The proof was found to be sufficient to support the State's position. Despite the inconsistencies highlighted by counsel, the jury evidently chose not to credit Thompson's self-serving statement in light of the other evidence introduced. Thus, petitioner has not demonstrated how the State presented false evidence or inconsistent theories and therefore, violated his due process rights. *See Housler*, 193 S.W.3d at 493. Discerning no violation of petitioner's due process rights with regard to inconsistent theories of prosecution, we accordingly conclude that counsel were not ineffective for failing to raise the issue of inconsistent theories at petitioner's resentencing hearing.

29

*5. Mitigation*

Petitioner contends that subsequent counsel were ineffective at the resentencing hearing for failing to present sufficient evidence of his mental conditions. He claims that the jury might have been convinced to impose a lesser sentence than the death penalty if it were made aware of this evidence.

As noted above, the two experts petitioner employed during post-conviction, Drs. Brown and Spica, concluded that he suffered from a cognitive disorder caused by damage to the frontal lobe of his brain that especially in times of stress, substantially affected his judgment and impaired his ability to conform his conduct to the law.

The evidence presented by petitioner during post-conviction is summarized above. The post-conviction court reviewed the evidence and noted that "this is clearly not a case in which counsel failed to conduct appropriate investigation into the accused's background and social history." In denying relief on this claim, the post-conviction court stated:

> The evidence establishes that counsel had at least most if not all the information from the investigation for the 1990 trial as well as the information developed by [their investigators] for the 2002 hearing. In addition, counsel had retained the psychological services of Dr. Engum. Petitioner criticizes counsel for not having sought further assistance when Dr. Engum did not find any evidence of brain damage. As alluded to above, generally much of the mitigation offered at the post-conviction hearing fell in line with the themes put forward by the defense at trial: the Petitioner was a model prisoner, with a history of certain psychological issues and a dysfunctional family that had moved frequently. The primary focus of the evidence was the Petitioner's ability to do well in a structured setting and his behavior as a model prisoner.
>
> [Subsequent counsel A] testified that in preparing for the hearing, there were several things they believed needed to be pursued from the Petitioner's records and counsel's prior file. He stated that the things that Dr. Brown had discussed in his testimony, such as family history, family dynamics, and problems, were things that they had been aware of when they worked on the case. After receiving the materials from the other attorneys, they picked up and interviewed the people and developed the issues. He stated that after they received Dr. Engum's report they did not believe that they could use a lot of the history and information in mitigation. He testified that he had confidence in Dr. Engum because he had worked with him previously and that based upon Dr. Engum's report, they could not substantiate a mental defense. The team

30

had believed that the best way to avoid the death penalty was to focus on the Petitioner's rehabilitation in the prison system. [Subsequent counsel A] also expressed concerns about presenting too many themes to the jury and spreading things out for the jury to think about concerning mitigation.

After carefully reviewing all the records, testimony, and applicable law, this Court finds that counsel [were] not deficient in their investigation and preparation of potential mitigating evidence for the Petitioner's capital re-sentencing hearing. Counsel hired experts to investigate both the facts of the case and any mitigation, as well as mental health experts to explore any available issues of mental health and/or brain damage. Petitioner would now have this court find counsel deficient for having relied upon those experts. This court, however, cannot agree. In considering the issue of deficiency, this Court's review must be a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time. Counsel relied upon the defense team and understood that certain potential mitigating witnesses or evidence would be helpful. Counsel made a strategic decision to focus on the theme of the Petitioner's favorable behavior in prison and to argue the inapplicability of the aggravating factor. They appropriately relied upon experts and formulated a strategy based on what they were provided.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). The right granted to capital defendants to present a vast array of personal information in mitigation during the sentencing phase, however, is constitutionally distinct from the question of whether counsel's choice about what information to present to the jury was professionally reasonable. The basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel has the duty to investigate and prepare for both the guilt and the penalty phase. *See Goad v. State*, 938 S.W.2d 363, 369-70 (Tenn. 1996); *see also Zagorski v. State*, 983 S.W.2d 654, 657 (Tenn. 1998).

When considering a claim that trial counsel failed to present sufficient mitigating evidence, our supreme court has directed the reviewing courts to consider the following: (1) the nature and extent of the mitigating evidence that was available but not presented; (2)

31

whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. *Goad*, 938 S.W.2d at 371. However, deference must be given to counsel's informed trial strategy. *Hellard*, 629 S.W.2d at 9. Trial counsel's conduct should not be measured in hindsight but, instead, should be assessed from counsel's perspective at the time. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Furthermore, the fact that a particular strategy failed or even hurt the defense does not, alone, support a claim of ineffective assistance of counsel. *Id*. Although there is no absolute duty to investigate particular facts or a certain line of defense, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In determining whether counsel breached this duty, counsel's performance is reviewed "for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's prospective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 688-89)). Counsel is not required to investigate "every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id*. at 533. Nor is counsel required to interview every conceivable witness. *See Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. *Id*.

We agree with the post-conviction court that this is not a case in which counsel failed to conduct any substantial investigation or present any meaningful mitigating evidence. At resentencing, petitioner was represented by three attorneys with significant criminal defense experience. They employed two investigators, had access to the file of the previous attorneys, and retained a qualified mental health expert to conduct a comprehensive evaluation of petitioner. In sum, defense counsel called no less than twelve witnesses to testify on behalf of petitioner during the resentencing hearing. Defense witnesses presented the jury with an overview of petitioner's social history and mental health status. Based upon their investigation and review of the results of Dr. Engum's evaluation, counsel elected to focus on petitioner's efforts toward rehabilitation while in prison. In light of Dr. Engum's findings, to which he testified at the hearing, counsel believed they would have had a difficult time convincing the jury that petitioner's mental status was sufficient mitigation. Rather, they decided to highlight petitioner's positive adjustment to prison life.

Petitioner is challenging defense counsel's chosen strategy in mitigation. This court, however, must indulge a strong presumption that the conduct of trial counsel falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Moreover, we must defer to counsel's sound strategic choices in the presentation of their defense.

32

*Hellard*, 629 S.W.2d at 9. Upon our review of the record in this case, we conclude that counsel conducted a reasonable investigation into mitigating evidence and, based upon the information they received, chose a reasonable strategy. Counsel's trusted expert found no evidence of brain damage. Petitioner introduced evidence through Drs. Brown and Spica at the post-conviction evidentiary hearing that he had a cognitive brain disorder that likely affected his judgment at the time of the crime. However, Drs. Craddock and Farooque, who evaluated petitioner over the course of approximately twenty-three days, as well as Dr. Engum, found no evidence of brain damage. Dr. Craddock also evaluated the Petitioner prior to the first trial and found no evidence of a cognitive disorder. Notably, Dr. Spica stated that his evaluation employed modern tests that may not have been available to Dr. Engum at the time of petitioner's first trial. Dr. Brown also acknowledged that the prior reports of the other experts were based on the testing done at the time.

A criminal defense attorney "must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. However, an attorney is only required to perform "as well as a lawyer with ordinary training and skill in the criminal law." *Id*. at 935. After a comprehensive examination, Dr. Engum found no evidence of brain damage. "A defense attorney is not required to question a diagnosis put forth by a professional expert in the field." *Christa Gail Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App. Apr. 25, 2011), *perm. app. denied* (Tenn. Nov. 15, 2011); *see Farris Genner Morris, Jr. v. State*, No. W2005-00426-CCA-R3-PD, 2006 WL 2872870, at *55 (Tenn. Crim. App. Oct. 10, 2006), *perm. app. denied* (Tenn. Feb. 26, 2007) ("We cannot find trial counsel deficient for relying upon the pre-trial evaluation finding the Petitioner competent and sane."); *Glenn Bernard Mann v. State*, No. W2002-00260-CCA-R3-CD, 2003 WL 22319581, at *32 (Tenn. Crim. App. Oct. 9, 2003), *perm. app. denied* (Tenn. Mar. 8, 2004) ("counsel's decision not to pursue [I.Q.] angle was reasonable based on his reliance upon Dr. Blair's recommendation"). Despite the fact that petitioner subsequently retained two experts who diagnosed him as having brain damage, counsel elected not to pursue the matter further at resentencing after reading Dr. Engum's report. Counsel developed their defense strategy based, in part, upon Dr. Engum's diagnosis.

Notwithstanding the fact that petitioner and counsel knew that some of the mental health experts did not find evidence of brain damage, petitioner maintains that counsel should have presented Dr. Brown's findings to the jury. Dr. Brown was given the facts surrounding the murder in this case and made the following comments:

> The available information concerning the time of the offense shows extraordinarily poor judgment and planning actions, even by the standards of

33

the average criminal. Both his planning and attempts to conceal those plans were obviously deficient.

. . . .

In the first place, the obvious purpose of murder for hire is to distance the individual from the crime. Secondly, the purpose of premeditation is to organize an effective plan that includes method and timing to achieve the goal. Typically, this also means taking effective steps to evade detection, before and after commission of the crime.

Instead, [petitioner] settled for dragging along an, at best, unwilling accomplice who thereby became an eyewitness to his involvement in the crime. In the second place, his preparations consisted of providing witnesses capable of testifying to his frequently repeated stated intent, his having the murder weapon, purchasing bullets and of his whereabouts and schedule for the night in question. Finally, he provided his fiancée, who appears to have been in complete ignorance of his actual circumstances, with a simply incredible explanation for his wife's death at the hands of unknown assailants. In the end he produced a panoply of virtually every kind of evidence of his direct involvement.

The post-conviction court concluded that Dr. Brown's testimony would not have affected the jury's sentencing decision: "The evidence of petitioner's efforts to employ someone to get rid of his wife so that he could get out of his marriage without losing financially was strong[,] and the alleged differences in the presentation of mitigating evidence would not have affected the jury's determination."

Similar to the post-conviction court, we cannot conclude, in light of the facts of this case, that any attempt by counsel to attribute petitioner's actions to possible brain damage would have affected the jury's sentencing decision. Counsel weighed their options and pursued a line of defense that was objectively reasonable given the facts known to them. This court concludes that subsequent counsel's presentation of the case at sentencing was not deficient or otherwise unreasonable. Accordingly, petitioner is not entitled to post-conviction relief on this basis.

### 6. Victim Impact Evidence

Petitioner also argues that counsel inappropriately solicited inadmissible victim impact evidence during his cross-examination of the victim's father. Specifically, in questioning the

victim's father about whether he approved of the victim's children visiting petitioner in prison, the victim's father stated that "they ought to hang the son of a b---h."

The specific line of questioning at issue is as follows:

Counsel: Had you told [petitioner's mother] that if there was contact with their father through them that they would be allowed to see the children again?

Mr. Saylor: No, I didn't say anything like that. I told them I didn't want that to happen.

Counsel: You didn't want what to happen, sir?

Mr. Saylor: For them to try and take them to the penitentiary where he's in jail. It would be bad influence on the children.

Counsel: Yes, sir. You certainly haven't encouraged any contact between the children and their father, have you?

Mr. Saylor: Absolutely none.

Counsel: And I understand, you're pretty bitter at [petitioner], aren't you?

Mr. Saylor: Wouldn't you be?

Counsel: Yes, sir. I understand, I do. I wasn't making it a bad thing but the bitterness is why you haven't encouraged the contact?

Mr. Saylor: No, it's not bitter. This man murdered my daughter for no damn reason.

Counsel: I understand.

Mr. Saylor: And they ought to hang the son-of-a-b---h.

Counsel: I understand.

Mr. Saylor: You got that?

35

Counsel:      I understand. And I understand your feelings, sir. Honestly. I'm
              not mad at you, that's not . . . .

Counsel:      Then quit pressing, because I don't want him to ever see the
              children again. I adopted them and they don't belong to him,
              they belong to me.

Counsel:      I understand.

Mr. Saylor:   Now, do you understand that?

Counsel:      I sure do, and I understand the feeling, but it's because of that
              feeling that you certainly haven't encouraged any contact
              between the two, have you?

Mr. Saylor:   He can't contact them, no. . .

Counsel subsequently elicited testimony from petitioner's mother explaining how the victim's father made it difficult for her to visit her grandchildren. He then argued during closing that petitioner's rehabilitation "certainly outweigh[ed] the need for vengeance."

The post-conviction court held that petitioner failed to establish prejudice on this claim. The court noted that counsel attempted to rebut the testimony of the victim's father with a plea to save petitioner's life through the testimony of his mother. The court also observed that the jury was properly instructed concerning the use of victim impact testimony:

The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. You may consider this evidence in determining an appropriate punishment.

However, your consideration must be limited to a rational inquiry into the culpability of the Defendant, not an emotional response to the evidence.

Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt the aggravating circumstance which has been alleged. You may consider this victim impact

36

evidence in determining the appropriateness of the death penalty only if you first find that the existence of the alleged aggravating circumstance has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance found outweighs the finding of one or more mitigating circumstances beyond a reasonable doubt.

The supreme court approved of the trial court's jury instruction in that regard on direct appeal. *See Stephenson*, 195 S.W.3d at 603-04. As it recognized,

[V]ictim impact evidence should generally be "limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family."

*Id.* at 604 (quoting *State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998)).

We concur with the post-conviction court's ruling. Petitioner did not examine subsequent counsel A during the evidentiary hearing about his reasoning behind this line of questioning. Accordingly, we cannot speculate on whether counsel's questions were part of their designed strategy. The State suggests that counsel may have intended to arouse the temper of the victim's father in front of the jury to portray him as a vengeful man in their attempt to present petitioner as a rehabilitated inmate undeserving of death. Regardless, because jurors are presumed to follow the trial court's instructions on the law, which in this case included instructions directing them not to allow emotions to impact their decision and explaining to them that victim impact evidence is not the equivalent of an aggravating circumstance, petitioner has not shown any resulting prejudice from counsel's conduct. *See State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). Petitioner is not entitled to relief on this claim.

### 7. *Peremptory Challenges*

Petitioner challenges counsel's conduct during voir dire. He alleges that three jurors were "automatic death penalty voters." Apparently relying upon trial counsel's unsuccessful attempts to strike those three jurors for cause, petitioner contends that counsel were ineffective by subsequently failing to use available peremptory challenges to remove them from the panel. Petitioner, however, neglected to identify those three jurors by name in his

brief, and he failed to specifically explain how they could be described as jurors who would not consider any penalty other than death for a defendant convicted of first degree murder.

The post-conviction court concluded that petitioner failed to establish deficient performance or prejudice on this ground:

> [Subsequent counsel A] testified that they had not exercised all of the peremptory challenges and that the only reason they would have done that was because they believed that they would get a less favorable juror based on the remaining jurors in the pool if they continued. The evidence also established that the attorneys did not base their decision on jurors on the questionnaire alone. [Subsequent counsel B] testified that they had done a personal ranking system of jurors but that the ranking changed some with personal contact through voir dire.

We agree with the post-conviction court's conclusions. This court recently addressed the role of defense counsel during jury selection in a capital case:

> Jury selection implicates an accused's state and federal constitutional rights to a competent, fair-minded, and unbiased jury. *See Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (recognizing that "[b]oth the United States and the Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury") . . . . The process of voir dire is aimed at enabling a defense lawyer (as well as a prosecutor) to purge the jury of members not meeting these criteria. *See United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) ("[T]he principal way this right [to an impartial jury] is implemented is through the system of challenges exercised during the voir dire of prospective jurors."); *Smith*, 357 S.W.3d at 347 (recognizing that "'[t]he ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial.'") (quoting *State v. Hugueley*, 185 S.W.3d 356, 390 (appx) (Tenn. 2006) . . . . As emphasized by the United States Supreme Court,
>
>> The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to *either* side of the case. Clearly, the extremes must be eliminated – i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.

*Morgan v. Illinois*, 504 U.S. 719, 734 n.7, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (quoting *Smith v. Balkcom*, 660 F.2d 573, 578 (5th Cir. 1981)).

As the United States Court of Appeals for the Sixth Circuit has asserted, "Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001). By posing appropriate questions to prospective jurors, a defense lawyer is able to exercise challenges in a manner that ensures the jury passes constitutional muster. *See United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973).

Despite its significance, a trial lawyer is "accorded particular deference when conducting voir dire " and his or her "actions during voir dire are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). Also, "[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id*. Thus, it is imperative for a petitioner claiming ineffective assistance of counsel during jury selection to demonstrate that the resulting jury was not impartial. *See Smith*, 357 S.W.3d at 348 (citing *James A. Dellinger v. State*, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049, at *30 (Tenn. Crim. App. Aug.28, 2007)).

*William Glenn Rogers v. State*, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675 at *35-36 (Tenn. Crim. App. Aug. 30, 2012), *perm. app. denied* (Tenn. Dec. 11, 2012).

Counsel in this case utilized written questionnaires and examined each juror individually during voir dire. Counsel testified that they did not use all of their available peremptory challenges, however, because they feared, based upon their impression of those individuals remaining in the jury pool, that there was a "substantial chance" they could end up with a less favorable jury. This was a reasonable strategic decision which this court will not second-guess. *See Steven Ray Thacker v. State*, No. W2010-01637-CCA-R3-PD, 2012 WL 1020227 at *50 (Tenn. Crim. App. Mar. 23, 2012), *perm. app. denied* (Tenn. Aug. 16, 2012) (counsel's decision to forego use of remaining peremptory challenges viewed as sound strategy when counsel affirmatively stated that jurors selected appeared more favorable than those remaining in pool). Again, although petitioner generally alleges that three jurors were "automatic death penalty voters," he did not offer any proof at the evidentiary hearing in support of those allegations. *See William Glenn Rogers*, 2012 WL 3776675 at *38 ("Absent other proof adduced at the post-conviction hearing, a petitioner claiming a biased jury must

39

rely upon the transcript of the voir dire."). Nor does he offer any specific argument on appeal as to how the overall responses of those jurors during voir dire exhibited any signs of actual bias.

Contrary to petitioner's assertion that all three contested jurors were unequivocally committed to voting for death, our review of jury selection reveals that each contested juror affirmatively stated that they would follow the judge's instructions and decide the case solely on the law and facts presented. Petitioner has not established how the jury impaneled during the resentencing hearing was partial or unfair. Accordingly, he is not entitled to relief on this claim.

### 8. *Death Penalty Statute*

Petitioner advances several challenges to Tennessee's death penalty statute. Although he challenged the statute in his original direct appeal, the supreme court did not address the issue because it remanded the case for resentencing. *Stephenson*, 878 S.W.2d at 558. Accordingly, because petitioner failed to reassert the instant challenges in the appeal from his resentencing hearing, they are waived in the post-conviction context. *See* Tenn. Code Ann. § 40-30-106(g). Furthermore, to the extent he relies upon an ineffective assistance of counsel claim to present these issues for review, his efforts fail as each challenge advanced has previously been denied by our supreme court. *See, e.g., State v. Hester*, 324 S.W.3d 1, 18-19 (Tenn. 2010) ("[W]e have found that the application of the death penalty in Tennessee is not rendered unconstitutional solely because locally elected District Attorneys General make discretionary charging decisions within a statutory framework established by the Tennessee General Assembly."); *id.* at 79-80 (upholding Tennessee's lethal injection protocol); *id.* at 80 (rejecting right to life claim).

### CONCLUSION

Based upon our thorough review of the record, the briefs of the parties, the arguments of counsel, prior opinions of this court and our supreme court, and applicable legal authority, we discern no error and affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE